UNITED STATES DISTRICT COURT

DISTRICT OF NEVADA

\* \* \*

| | |
|---|---|
| DESERT SUN ENTERPRISES LIMITED /d/b/a/ CONVENTION TECHNICAL SERVICES, a Nevada limited-liability company,<br><br>　　　　　　　　　　　　Plaintiff,<br><br>　　v.<br><br>INTERNATIONAL BROTHERHOOD OF ELECTRICAL WORKERS LOCAL UNION 357; INTERNATIONAL BROTHERHOOD OF TEAMSTERS, LOCAL 631; and SOUTHERN NEVADA BUILDING AND CONSTRUCTION TRADES COUNCIL,<br><br>　　　　　　　　　　　　Defendants. | No. 2:13-cv-01885-RFB-NJK<br><br>**ORDER DENYING DEFENDANT'S MOTION TO DISMISS**<br><br>(ECF No. 15) |

**I.    INTRODUCTION**

The instant case arises from an alleged unlawful secondary boycott. Plaintiff Desert Sun Enterprises Limited d/b/a Convention Technical Services ("CTS") filed a complaint alleging that Defendant International Brotherhood of Electrical Workers, Local Union No. 357 ("Local 357") engaged in unlawful secondary activity under 29 U.S.C. 158(b) when it threatened an area standards strike with the improper intent of forcing neutral third parties to cease doing business with CTS and to coerce CTS to replace International Union of Operating Engineers, Local 501 ("Local 501") employees with Local 357 employees. Local 357 then filed the instant motion to dismiss under FRCP 12(b)(6), claiming that CTS has failed to allege sufficient facts to show that Local 357 plausibly committed an unlawful secondary boycott. Because the Court finds that CTS

1  has stated a claim for unlawful secondary boycott, Local 357's motion is denied.

**II.     BACKGROUND**

The following background information is taken from CTS's amended complaint. Am. Compl., ECF No. 5. The ABC Kids Expo ("Expo") was scheduled to take place October 15-18, 2013, at the Las Vegas Convention Center. Id. ¶ 9. Fern Exposition Services ("Fern") was the official general services contractor for the show. Id. Fern contracted with CTS to provide portable electrical power to the exhibitors at the show. Id. at ¶ 15. CTS then hired electrical technicians from Local 501 to perform the portable electrical work pursuant to the parties' 2009 labor agreement. Id. ¶ 19. Members of the International Brotherhood of Teamsters, Local 631 ("Teamsters 631") were hired to install and dismantle the individual booths at the show, and Teamsters 631 employees constituted the largest workforce on the show floor. Id. ¶¶ 16-17.

On October 9, 2013, by letter sent to the Southern Nevada Building and Trades Council ("Trades Council"), Local 357 requested an area standards strike sanction against CTS, and the Trades Council approved the request. Id. ¶ 20, 22. CTS also sent a copy of the strike sanction request to the Las Vegas Convention and Visitor's Authority. Id. ¶ 20. That afternoon, a business representative of Teamsters 631 told representatives of Fern, representatives of CTS, and others that the Trades Council had approved Local 357's request for a strike sanction. Id. ¶ 23. The Teamsters 631 representative also informed Fern and CTS that Local 357 "would establish a picket line at the Convention Center that night and that Teamsters 631 would honor it by telling its members they could cross or not cross as they saw fit." Id. ¶ 23. Fern was concerned about delaying or losing the Expo, so it instructed CTS to terminate the Local 501 employees. Id. ¶ 25. Fern then replaced the Local 501 employees with Freeman Electrical's employees, who were members of Local 357. Id. As a result, CTS was forced to reimburse Fern for its labor cost of using Local 357 employees. Id. This reimbursement cost was higher than the cost would have been had CTS been able to use Local 501 employees as it had planned. Id.

CTS alleges that Local 357 engaged in a secondary boycott in violation of 29 U.S.C. § 158(b). CTS claims that Local 357 threatened to picket with the unlawful intent of coercing or

- 2 -

restraining neutral third parties, including the Convention Center, ABC, and Fern, from doing business with CTS and forcing Fern to assign the portable electrical work to Local 357 employees instead of Local 501 employees. Local 357 now moves to dismiss.

### III. LEGAL STANDARD

An initial pleading must contain "a short and plain statement of the claim showing that the pleader is entitled to relief." Fed. R. Civ. P. 8(a). The court may dismiss a complaint for failing to state a claim upon which relief can be granted. Fed. R. Civ. P. 12(b)(6). In ruling on a motion to dismiss, "[a]ll well-pleaded allegations of material fact in the complaint are accepted as true and are construed in the light most favorable to the non-moving party." Faulkner v. ADT Sec. Servs., Inc., 706 F.3d 1017, 1019 (9th Cir. 2013) (citations omitted).

To survive a motion to dismiss, a complaint need not contain "detailed factual allegations," but merely asserting "'labels and conclusions' or 'a formulaic recitation of the elements of a cause of action'" is not sufficient. Ashcroft v. Iqbal, 556 U.S. 662, 678 (2009) (quoting Bell Atlantic Corp. v. Twombly, 550 U.S. 544, 555 (2007)). In other words, a claim will not be dismissed if it contains "sufficient factual matter, accepted as true, to state a claim to relief that is plausible on its face," meaning that the court can reasonably infer "that the defendant is liable for the misconduct alleged." Iqbal, 556 U.S. at 678 (citation and internal quotation marks omitted). In elaborating on the pleading standard described in Twombly and Iqbal, the Ninth Circuit has held that for a complaint to survive dismissal, the plaintiff must allege non-conclusory facts that, together with reasonable inferences from those facts, are "plausibly suggestive of a claim entitling the plaintiff to relief." Moss v. U.S. Secret Serv., 572 F.3d 962, 969 (9th Cir. 2009). In sum, at the motion to dismiss stage, "[t]he issue is not whether a plaintiff will ultimately prevail but whether [he] is entitled to *offer* evidence to support the claims." Cervantes v. City of San Diego, 5 F.3d 1273, 1274-75 (9th Cir. 1993) (quoting Scheuer v. Rhodes, 416 U.S. 232, 236 (1974)) (emphasis in original).

"As a general rule, a district court may not consider any material beyond the pleadings in ruling on a Rule 12(b)(6) motion." Lee v. City of Los Angeles, 250 F.3d 668, 688 (9th Cir. 2001)

1  (citation and internal quotation marks omitted). If the district court relies on materials outside the
2  pleadings submitted by either party to the motion to dismiss, the motion must be treated as a
3  Rule 56 motion for summary judgment. Anderson v. Angelone, 86 F.3d 932, 934 (9th Cir. 1996).
4  Two exceptions to this rule exist: First, the court may consider extrinsic material "properly
5  submitted as part of the complaint," meaning documents either attached to the complaint or upon
6  which the plaintiff's complaint necessarily relies and for which authenticity is not in question.
7  Lee, 250 F.3d at 688 (citation omitted). Second, the court "may take judicial notice of matters of
8  public record." Id. (citation and internal quotation marks omitted).

### IV.  DISCUSSION

In addition to the pleadings, the Court will consider Local 357's request for a strike sanction. ECF No. 5 Ex. 1. Because the letter was "properly submitted as part of the complaint," the Court may do so without converting the instant motion into a Rule 56 motion for summary judgment. Lee, 250 F.3d at 688. The Court declines, however, to take judicial notice of the exhibits attached to CTS's opposition, which are not properly before it. Opp. Mot. Dismiss Ex. 1-6, ECF No. 25.

**A.  CTS Has Adequately Pled Its Secondary Boycott Claim Against Local 357**

First, Local 357 argues that CTS has not adequately pled its secondary boycott claim because CTS has failed to show that Local 357 intended to cause disruption of a secondary employer's business. Mot. Dismiss at 4, ECF No. 15. According to Local 357, because the threatened picket would have complied with the standards set forth in Sailors' Union of the Pacific (Moore Dry Dock), 92 NRLB 547, 549 (1950), the threatened picket was lawful. Id. CTS counters that compliance with the Moore Dry Dock standards is not dispositive and that the totality of the circumstances show that Local 357 had the improper intent of influencing a secondary employer's business. ECF No. 25 at 9.

Section 8(b)(4) of the National Labor Relations Act defines a secondary boycott as an unfair labor practice. According to this section, a union may not use or threaten to use economic pressure against a neutral, or "secondary," employer with the goal of getting the secondary

1  employer to cease doing business with the "primary" employer (the employer with whom the
2  union has a dispute). N.L.R.B. v. Ironworkers Local 433, 850 F.2d 551, 554 (9th Cir. 1988).
3  The line between legitimate primary and unlawful secondary activity is relatively easy to draw
4  where primary and secondary employers have separate work sites. The line becomes less clear
5  where, as here, the site for the prospective picket is shared by both the primary and secondary
6  employer.

7  In these so-called "common situs" cases, a court may consider the four criteria
8  originally set forth in Moore Dry Dock to help determine whether a union has the proscribed
9  motive of enmeshing neutral employers: "(1) The picketing is strictly limited to times when the
10 situs of the dispute is located on the secondary employer's premises; (2) At the time of the
11 picketing the primary employer is engaged in its normal business at the situs; (3) The picketing is
12 limited to places reasonably close to the location of the situs; and (4) The picketing discloses
13 clearly that the dispute is with the primary employer." Ironworkers Local 433, 850 F.2d at 554
14 (citing Moore Dry Dock, 92 N.R.L.B. at 549). Importantly, however, the ultimate inquiry is
15 whether "the ***totality of the circumstances*** demonstrate[s] impermissible secondary intent (or
16 lack of it)." Ironworkers Local 433, 850 F.2d at 554 (emphasis added). Thus, "[l]iteral
17 compliance (or failure to comply) with the Moore Dry Dock standards ***does not preclude*** (or
18 establish) a § 8(b)(4) violation . . . if the district court determines that the totality of the
19 circumstances demonstrate impermissible secondary intent (or lack of it)." Constar, Inc. v.
20 Plumbers Local 447, 748 F.2d 520, 522 (9th Cir. 1984) (emphasis added).

21 CTS has plausibly claimed that the threatened picket was secondary in nature. CTS
22 alleges that Local 357 requested that the Trades Council issue an area standards strike sanction
23 against CTS and that Local 357 sent a copy of this request to the Las Vegas Convention and
24 Visitors Authority. CTS alleges that Local 357 threatened the picket with the unlawful intent of
25 either forcing the Convention Center, Fern, and ABC to stop doing business with CTS or
26 coercing CTS to assign the portable electrical work to Local 357 instead of Local 501, with
27 which CTS had already contracted do the work.

28 The Court rejects Defendants' argument that the case must be dismissed because the

1  picket would have adhered to the Moore Dry Dock criteria. The Court has no factual basis for
2  making such a conclusion, as no facts are alleged in the Amended Complaint that would support
3  a finding that the picket would have complied with Moore Dry Dock. Further, Local 357's letter
4  to the Trades Council, which the Court considers as material properly submitted as part of the
5  complaint, contains no details about when, where or how the picket would be conducted or
6  whether it would conform to Moore Dry Dock. At this stage in the case, particularly in the
7  context of a motion to dismiss and drawing all factual inferences in favor of the Plaintiff, the
8  Court cannot conclude, based solely upon the allegations in the Amended Complaint, that a
9  boycott would have complied with Moore Dry Dock. The Court finds that CTS has adequately
10 alleged that the totality of the circumstances indicate Local 357 acted with impermissible intent.

11 Local 357 next argues that CTS's claim should be dismissed because a threat to picket a
12 common jobsite does not constitute a secondary boycott. ECF No. 15 at 6 (citing Ironworkers
13 Local 433, 850 F.2d at 557-58). Local 357 is correct that, absent additional evidence suggesting
14 an unlawful purpose, a threat to picket a common jobsite is not a secondary boycott under the
15 Act. However, Ironworkers Local 433 also held that the "primary question" in assessing whether
16 there has been a violation "is not whether particular words were used, or a disclaimer issued, but
17 how, given the context of the conversation, the union's statements should reasonably be
18 understood." 850 F.2d at 557. In this case, CTS has adequately alleged that Local 357's actions
19 could reasonably be understood as a threat to engage in unlawful picketing.

20 CTS alleges that Local 357 acted with the unlawful objective of either forcing the
21 Convention Center, Fern, and ABC to stop doing business with CTS or coercing CTS to assign
22 the portable electrical work to Local 357 instead of Local 501. In support of this claim, CTS
23 alleges that Local 357 sent a copy of the request to the Las Vegas Convention Center and
24 Visitors Authority, a neutral party with a connection to and influence with the secondary
25 employer Fern. The letter sent to the Convention Center is vague: it does not specify the nature
26 and extent of the picket, nor does it detail when or where the picket would be conducted. While
27 failure to assure a secondary employer that a picket will comply with Moore Dry Dock is not a
28 *per se* violation of the Act under Ironworkers Local 433, it is plausible that the letter Local 357

sent to the Convention Center could, "given the context of the conversation," reasonably be understood as a threat to engage in unlawful picketing. Id. CTS has alleged sufficient facts to plausibly show that the strike sanction request, taken with the totality of the circumstances, shows that Local 357's purpose was unlawful. Therefore, the court declines to dismiss CTS's claim on this ground.

### B.  CTS May Seek Monetary Damages Against Local 357

Local 357 also argues that CTS has failed to state a claim, since lost wages are not compensable under the Act. ECF No. 15 at 7. CTS seeks to recover its additional costs for reimbursing Fern for the labor costs Fern incurred as a result of hiring employees (from Local 357) from Freeman Electrical. CTS alleges that it had to reimburse Fern for a higher cost than it would have had to pay if it had been able to use Local 501 employees as initially planned. CTS also claims it suffered and continues to suffer damages to its business relationships, prospective business relationships, and goodwill.  ECF No. 5 at 5-6.

Section 303 of the National Labor Relations Act limits recovery in suits filed in district court under the Act to damages and costs. 29 U.S.C. § 187(b). Damages recoverable under Section 303 "include actual compensatory damages for out-of-pocket expenses paid to third parties as a result of the picketing, but do not include wages paid to employees pursuant to a contract." Matson Plastering Co. v. Plasterers and Shophands Local No. 66, 852 F.2d 1200, 1203 (9th Cir. 1988). The damages the Ninth Circuit denied in Matson Plastering, the case upon which Local 357 relies, are distinguishable from those sought by CTS. In that case, the employer simply recast its claim for rescission of contract as one for damages for "excess wages" it paid its own employees under a labor contract it signed with the union after the union picketed. Id. at 1202.  In the instant case, Fern made a last-minute decision to replace the Local 501 employees with Freeman Electrical's Local 357 employees. And, most significantly, Fern, not CTS, was the company that paid these replacement workers. CTS did not pay additional wages pursuant to a contract. Instead, it reimbursed Fern for the labor cost that Fern, a third party, incurred by hiring Local 357 employees. The out-of-pocket expenses related to labor costs CTS paid to Fern in response to the threat of a boycott are recoverable.

## IV. CONCLUSION

**IT IS THEREFORE ORDERED** that Defendant International Brotherhood of Electrical Workers, Local Union No. 357's motion to dismiss (ECF No. 15) is **DENIED**.

DATED this 23rd day of January, 2015.

**RICHARD F. BOULWARE, II**
**UNITED STATES DISTRICT JUDGE**